UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

ROBERT L. SINCLAIR                                                                                          PLAINTIFF

v.                                                                      CIVIL ACTION NO. 3:11-CV-468-S

PATRICK R. DONAHOE,
United States Postmaster General                                                 DEFENDANT

**MEMORANDUM OPINION**

Currently pending before the court is a motion for summary judgment filed by Defendant Patrick R. Donahoe, Postmaster General, United States Postal Service (DN 30). For the reasons stated herein, that motion will be granted and the action will be dismissed with prejudice.

**I.**

Plaintiff Robert L. Sinclair brought this employment discrimination action after the termination of his employment as an Automation Mail Processing Clerk at the Louisville, Kentucky Postal & Distribution Center in 2010. At the time he was fired, Sinclair, who is black, had been working for the Postal Service for approximately 11 years.

In the two years leading up to his termination, Sinclair was disciplined on various occasions in the form of being issued letters of warning. In June of 2008, he was issued a letter of warning called an "N-TOL #1 (Letter of Warning)". The N-TOL #1 stated that Sinclair had been observed "not properly jogging and/or edging mail . . . for approximately thirty (30) minutes."[1]

---

[1] The record in this case contains many terms of art relevant to the operation of the Postal & Distribution Center, such as "jogging" and "edging" mail. The record also focuses on many alleged mistakes made by Sinclair that resulted in "out-of-sequence errors" or required mail to be

(continued...)

Next, in October of 2008, Sinclair was issued an "N-TOL #2 (Letter of Warning in lieu of 7-Day suspension)," which accused him of placing eight trays of processed mail into the wrong dispatch container, causing the mail in those trays to be delayed, as well as failing to initial the Placard/Header on the dispatch containers, which he had previously been instructed to do. After receiving that N-TOL#2, Sinclair filed a grievance. The parties came to a settlement agreement pursuant to which the N-TOL #2 was reduced to an "Official Job Discussion." The settlement agreement states that there were "multiple employees involved with the mail dispatch" and "[m]anagement could not specifically say the grievant committed the stated violation."

In December of 2008, Sinclair received an "N-TOL #3 (Letter of Warning in lieu of 14-Day Suspension)." That letter stated that during one particular shift, Sinclair had twelve "out-of-sequence errors and failed to call an Electronic Technician (E.T.) in order to determine why the mail was out of sequence before restarting the machine." Sinclair filed a grievance as to that letter of warning, and the matter was settled by the parties, this time by reducing the N-TOL #3 to an N-TOL #2, which was to stay in his file for one year.

Then, on July 2, 2009, Sinclair was issued an N-TOL #3 for having "mis-swept" mail into the wrong trays. After Sinclair filed a grievance, the parties came to a settlement agreement on October 8, 2009. The settlement agreement stated,

> The parties agree that in accordance with the grievant's EEO Mediation Settlement Agreement dated August 19, 2009, "The N-TOL #3 issued on July 2, 2009 will be reduced to a N-TOL #2 and will stay in the grievant's file for two (2) years. It will expire on July 2, 2011 . . ."

---

[1](...continued)
"re-swept" or "re-ran." The court notes that, although not strictly necessary for it to render a decision on the summary judgment motion, it would have made for easier reading of the briefs had either party taken the time to explain some of the technical jargon.

Sinclair was next issued an N-TOL #3 in December of 2009. That N-TOL #3 charged that Sinclair had "contributed" to 29 "full stacker bin occurrences" by "not adjusting the flow to the same bins" and "by not keeping the mail at/or below the 50% capacity stacker level." The N-TOL #3 noted that "full stackers" cause "jams," "missorts," "rehandling of mail," and "out of sequence errors." Once again, Sinclair filed a grievance. The ensuing settlement agreement provided that the N-TOL #3 would be reduced to an N-TOL #2, which would remain in Sinclair's file until September 16, 2010.

Then, during April of 2010, Sinclair was twice accused by the Postal Service of improper conduct. The first accusation was based on events that took place on April 6, 2010. That date, Sinclair was working as a "feeder" on a machine. According to the Postal Service, Sinclair "skipped multiple mail trays" that in turn caused approximately 620 pieces of mail to be out of order. In addition, four "out-of-sequence" errors on Sinclair's machine were entered into the Log Book that night. According to Sinclair, he did not skip any mail trays on that date.

The second incident took place on April 29. Sinclair was assigned to machine number 70. His co-worker, Jamie Augenstein, who was white, was assigned to machine number 71. According to Augenstein, she was leaving for a break when she noticed Sinclair taking mail out of one of her trays and putting it in a different tray. Augenstein believed that Sinclair was trying to cause out-of-sequence errors. Then, according to Augenstein, Sinclair returned to his machine; Sinclair had not noticed Augenstein watching him. For his part, Sinclair denies that he tampered with mail in Augenstein's trays.

Augenstein notified Brenda Martin, a Supervisor, as to her observations of Sinclair. Additionally, Richard Cannon, a Manager of Distribution Operations, was notified. Augenstein

provided Martin and Cannon a written statement concerning her observations of Sinclair. Cannon and Martin also ran the three trays of mail that Sinclair had supposedly tampered with through the machine. Those three trays had mail that was supposed to be in other trays. Sinclair was placed in Emergency Off-Duty status.

On May 14, 2010, the Postal Service issued Sinclair a Notice of Proposed Removal. That notice contained two charges against Sinclair: (1) Unsatisfactory Work Performance based on the April 6, 2010 events; and (2) Improper Conduct stemming from the April 29, 2010 events. The Notice stated that Sinclair's previous disciplinary record was taken into consideration in determining that he should be terminated.

Sinclair, through his union representative, Kevin Rutherford, requested review of the Notice of Proposed Removal by Ken Ford, a Senior Manager of Distribution Operations at the Postal Service. Sinclair and Rutherford met with Ford on May 31, 2010. According to a Letter of Decision dated June 21, 2010, Sinclair told Ford at that meeting that he did not skip any mail trays on April 6, 2010. As to the events of April 29, 2010, Sinclair initially stated that "employees routinely clean out other machines to help out their co-workers," but later admitted that he had not helped clean any other machines on April 29. In his Letter of Decision, Ford found that Sinclair was not credible, that the charges in the Notice of Proposed Removal were fully supported by the evidence, and that Sinclair's removal was warranted. The effective date of his removal was June 26, 2010.

Sinclair appealed to the Merit Systems Protection Board ("Merit Board"). On December 8, 2010, Administrative Judge Alexander G. Thompson held a hearing. Sinclair was represented by an attorney, and both Sinclair and the Postal Service called and cross-examined witnesses. At the

hearing, Sinclair denied that he skipped trays on April 6, 2010 and denied tampering with Augenstein's mail on April 29, 2010.

On March 29, 2011, Administrative Judge Thompson issued an Initial Decision. Judge Thompson found that the Postal Service had proved that Sinclair had engaged in unsatisfactory work performance by skipping 3 trays of mail on April 6, 2010 and had engaged in improper conduct by taking mail from one tray and putting it in another on a machine to which he was not assigned. Judge Thompson also rejected Sinclair's claims that the Postal Service discriminated against him because of his race or retaliated against him for prior Equal Employment Opportunity ("EEO") activity. Sinclair appealed to the United States Equal Employment Opportunity Commission, Office of Federal Operations, which upheld the Merit Board's decision.

**II.**

To prevail on a motion for summary judgment, the movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact arises when there is sufficient evidence on which a jury could reasonably find for the non-moving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1985). The disputed issue need not be resolved conclusively in favor of the non-moving party, but that party must present sufficient probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-289 (1968). Finally, the evidence must be construed in the light most favorable to the non-moving party. *Summers v. Leis*, 368 F.3d 881, 885 (6th Cir. 2004).

**III.**

Sinclair claims that the Postal Service discriminated against him on the basis of race. He acknowledges that his claim of race-based discrimination is based on circumstantial, rather than direct, evidence. Thus, his claim must be assessed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as modified in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 91981). *See Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 390 (6th Cir. 2009). To make out a prima facie case of discrimination, a plaintiff must show that (1) he was a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for his position; and (4) a person outside the protected class was treated more favorably than him. *Clay v. United Parcel Serv.*, 501 F.3d 695, 703 (6th Cir. 2007). In assessing whether a plaintiff has established a prima facie case, "[t]he key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence that he or she suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." *Id.*

The parties' dispute focuses on the fourth prong: whether Sinclair can establish that a similarly-situated person outside the protected class was treated differently. To establish the fourth prong, the plaintiff must "show that the person treated more favorably was similarly situated to the plaintiff in all relevant respects." *Clay*, 501 F.3d at 703. Sinclair's argument is that Augenstein, a white employee, was treated differently than him during the investigation of the April 29, 2010 incident.

In particular, Sinclair asserts that Augenstein was interviewed by management about the April 29 incident, but he was not. However, the record does not support Sinclair's assertion in that

regard. Sinclair cites to Cannon's testimony at the Merit Board hearing, in which Cannon states that he did not "personally" meet with Sinclair on the night of the incident, although Cannon did talk to Augenstein (DN 31-1 at 68). But elsewhere in his testimony, Cannon makes clear that Martin did give Sinclair the opportunity to make a statement that night (*id.* at 59). Additionally, the Notice of Proposed Removal issued by Martin to Sinclair notes that she spoke to Sinclair about the incident, both that night and again approximately one week later, and both times Sinclair denied being involved in tampering with any mail in the trays for Augenstein's machine (DN 30-13). Martin's Merit Board hearing testimony was the same (DN 31-1 at 14-15, 33-34). Simply put, Sinclair points to no evidence in the record supporting his assertion that he was not allowed to make a statement on April 29, but there is substantial evidence in the record to the contrary.

Moreover, Sinclair and Augenstein simply were not similarly situated as regards the investigation. Augenstein had reported to Martin and Cannon that Sinclair was intentionally mis-sorting Augenstein's mail and the two supervisors found evidence supporting that allegation when they ran the supposedly tampered-with trays and found mis-sorted mail. By contrast, there had never been any report, much less one substantiated by independent investigation, that indicated that Augenstein had engaged in any improper behavior. Thus, it cannot be said that Augenstein was "similarly situated to the plaintiff in all relevant respects." *Clay*, 501 F.3d at 703.

Sinclair further bemoans other aspects of the investigation. For instance, he suggests that Martin and Cannon should have interviewed various potential witnesses or tested more trays of mail to determine whether trays he was not accused of tampering with also contained mis-sorted mail. Sinclair speculates that the mis-sorted trays could have been due to machine malfunction, or, alternatively, that Augenstein herself may have mis-sorted the mail and then blamed Sinclair. But

Sinclair's complaints about the extent of the investigation are largely beside the point. The only question before this court is whether Sinclair was treated differently from a similarly-situated employee outside Sinclair's protected class. The court is not a "super personnel department" that oversees the adequacy of a workplace's investigation into allegations of improprieties by one of its employees. *See Holt v. Fed. Express Corp.*, 2012 WL 3264935, at *6 (W.D.Ky. Aug. 9, 2012). Thus, the court will not second-guess how many trays of mail should have been tested or how many witnesses needed interviewing. Instead, it suffices to say that the Postal Service conducted a reasonable investigation of the allegations and there is not a scintilla of evidence that the manner of the investigation or its outcome were driven by racial discrimination.

Sinclair also notes in his response to the summary judgment motion that nobody besides himself had ever been terminated for mis-sorting mail. But that statement is insufficient for Sinclair to meet his burden of showing a prima facie case. Rather, he must show that a similarly-situated employee was treated differently. In other words, since Sinclair, an employee with a fairly extensive disciplinary history, was terminated for having intentionally mis-sorted mail, he must put forth evidence sufficient to establish that at least one other employee with a similarly extensive disciplinary history had intentionally mis-sorted mail but was not terminated. He has not done so.

Put simply, there are no circumstances in this case that give rise to any inference of racial discrimination. Sinclair thus cannot establish a prima facie case of race discrimination.

**IV.**

Sinclair also argues that the Postal Service retaliated against him for filing an EEO complaint. As with his claim of racial discrimination, Sinclair does not argue that he has direct evidence of retaliation, but instead attempts to establish his retaliation claim circumstantially under

the *McDonnell Douglas/Burdine* framework. To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in protected activity, (2) his employer was aware of the protected activity; (3) he suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531 (6th Cir. 2008).

As an initial matter, the court notes that although Sinclair's response to the motion for summary judgment suggests that Sinclair filed multiple EEO complaints against the Postal Service (DN 34 at 1, ¶ 4), the only portion of the record to which either party points that discusses an EEO complaint is the October 8, 2009 settlement agreement stemming from the grievance filed by Sinclair concerning the July 2009 letter of warning he was issued. That settlement agreement states that the July 2009 letter of warning was being reduced from an N-TOL #3 to an N-TOL #2 in accordance with the settlement agreement the parties entered into in August 2009 concerning an EEO complaint Sinclair had filed.

Turning to the arguments at hand, Defendant concedes that Sinclair filed an EEO complaint, that the Postal Service was aware of the complaint, and that Sinclair thereafter suffered an adverse employment action when he was fired. But Defendant contends that Sinclair cannot establish any causal connection between his EEO complaint and his firing. Sinclair makes two arguments as to the causal connection. First, he contends that "the temporal relationship between the protected activity and the adverse employment action" shows a causal connection. Second, he states that "Sinclair's prior discipline had been reduced because of his engagement in protected activity" and "[t]hat prior discipline was used against Mr. Sinclair as a basis for the discipline resulting from the immediate action."

We begin with the second argument, concerning Sinclair's prior discipline. It is true that Sinclair's EEO complaint resulted in a settlement agreement pursuant to which the July 2009 N-TOL #3 was reduced to an N-TOL #2. It is also true that Sinclair's prior disciplinary history, including the July 2009 N-TOL #2, was considered by the Postal Service when it decided to fire him. But the court is at a loss to see how those facts demonstrate a causal connection between the filing of an EEO complaint and his termination. Put another way, even if Sinclair had not filed the EEO complaint that resulted in the reduction of the severity of his July 2009 discipline, Sinclair would still have had the July 2009 letter of warning as part of his disciplinary history, and the Postal Service undoubtedly would still have considered that portion of his disciplinary history when subsequently disciplining him. Thus, it was not the EEO complaint that had a causal connection with Sinclair's termination, but the fact that he had engaged in past conduct that required disciplining him through a letter of warning.

Nor does Sinclair's temporal proximity argument fair any better. As noted above, it was on October 8, 2009 that Sinclair and the Postal Service signed a settlement agreement reducing the July 2009 letter of warning from an N-TOL #3 to an N-TOL #2. Sinclair was terminated based on events that occurred over six months later, on April 29, 2010. Thus, his firing hardly followed close on the heels of his EEO complaint. *See Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th cir. 1986) ("The mere fact that Cooper was discharged four month after filing a discrimination claim is insufficient to support an interference [sic] of retaliation.").

Simply put, Sinclair has not identified any facts, contested or not, that could serve to establish a causal connection between his EEO complaint and his firing. His retaliation claim must therefore be dismissed.

## V.

In sum, Defendant is entitled to summary judgment. This action will be dismissed with prejudice. A separate order will issue in accordance with this opinion.

July 31, 2013

**Charles R. Simpson III, Senior Judge**
**United States District Court**